STEVEN R. SUMSION (#8317)
KEVIN R. WORTHY (#13900)
JASON ZUNDEL (#15293)
**SUMSION BUSINESS LAW, LLC**
3651 North 100 East, Suite 300
Provo, Utah 84604
Phone: (801) 375-2830
Email: steve@businesslawutah.com
kevin@businesslawutah.com
jason@businesslawutah.com

*Attorneys for Plaintiff*

---

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **LACIE PETERSON,** an individual,<br><br>Plaintiff,<br><br>v.<br><br>**AVALON HEALTH CARE, INC.**, a Utah corporation d/b/a AVALON HEALTH CARE GROUP,<br><br>Defendant. | **COMPLAINT AND JURY DEMAND**<br><br>Case Number<br><br>Judge |

Plaintiff, Lacie Peterson, by and through her counsel, submits this Complaint and Jury Demand against the above-named Defendant, Avalon Health Care Group, and alleges as follows:

DESCRIPTION OF THE PARTIES

1. Plaintiff, Lacie Peterson ("Peterson"), is an individual residing in Utah County, Utah.

2. On information and belief, Defendant Avalon Health Care, Inc. d/b/a Avalon Health Care Group ("Avalon") is a Utah corporation located in Utah.

## JURISDICTION AND VENUE

3. This action is civil in nature, arises under 42 U.S.C. § 2000e et seq., and has been authorized for filing by the Equal Employment Opportunity Commission. The Defendant has more the 15 employees.

4. This Court has jurisdiction over the federal claims in this case under 28 U.S.C. § 1331.

5. This Court has jurisdiction over the state law claims in this case under 28 U.S.C. § 1367.

6. The Defendant and Plaintiff both reside or have their principal place of business in this district and a substantial part of the events giving rise to the claim occurred in this district. Venue in this Court is therefore proper under 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

6. On or about June 10, 2013, Peterson applied online for the position "Lead Director of Housekeeping" with Avalon. *See* Application Letter, a true copy of which is attached as **Exhibit A.**

7. The Avalon website described the "Lead Director of Housekeeping" (also referred to as "Housekeeping Director") position as an administrative position that was responsible for hiring other housekeepers and overseeing housekeeping under the direction of the Maintenance Manager.

8. On or around June 20, 2013, Peterson went through an interview process, meeting and

interviewing with several members of Avalon's management, including Building Administrator Shauna Krause ("Krause"), Administrative Assistant Michelle Stanley ("Stanley"), Maintenance Supervisor Kelly Lawson ("Lawson"), and Lead Chef Tim Dalton ("Dalton").

9. On or around June 27, 2013, Avalon hired Peterson as its Housekeeping Director.

10. Lawson informed Peterson of the hiring decision by sending the following message via text to the personal cell phone of Peterson: "I want you as my lead housekeeper. Work will be M/W/F. Part-time until arrangements can be made." See Compilation of Kelly Lawson Text Messages, a true copy of which is attached as **Exhibit B.**

11. Subsequent conversations between Lawson and Peterson made clear that until there were residents in the building, Peterson would not work more than 30 hours per week, with a work schedule of Monday, Wednesday, and Friday from 8:30 AM to 4:30 PM. Exhibit B..

12. Peterson explained to Lawson that her two-year-old son would be going to daycare for the first time and that this work schedule was a vital reason for accepting the position. Exhibit B.

13. Lawson assured Peterson that he was the "most laid back guy" and would be flexible with her schedule to accommodate her day-care needs. Exhibit B.

14. On or around June 28, 2013, prior to Peterson beginning her actual work at Avalon, Lawson sent additional text messages to Peterson describing her as "Sexy," indicating a personal interest in Peterson, and asking whether "it would be inappropriate to ask you out on a date" Exhibit B.

15. Peterson responded by making it very clear to Lawson that she was uncomfortable with

        his sexual advances. She explained to Lawson via text, "I'm in a place right now that 'sexy' wouldn't describe the way I feel. Secondly, I am very hesitant to get involved…with the supervisor of my new job I haven't even started!" Exhibit B.

16. Peterson further explained that she was going through a divorce and was not interested in pursuing any kind of personal relationship with Lawson or anyone else, particularly her new boss. Exhibit B.

17. On or about July 15, 2013, Peterson began her employment as Housekeeping Director at the Avalon Facilities.

18. Despite forcefully and clearly telling Lawson that she was not interested in a romantic relation with Lawson, Lawson would not be deterred. During the first few days of work, in a wide hallway with plenty of room, Lawson grabbed Peterson's hips as he passed her, despite specific and clear requests that he stop. Lawson also commented to Peterson that he thought "I bet you are the type of girl who just wants sex once a month." Exhibit B.

19. On or about July 16, 2013, Peterson again made it very clear to Lawson that she had no interest in having a romantic relationship, explaining to Lawson in a text: "I will be a great right hand man but as far as a personal, physical relationship, I won't be going there with you. You're my supervisor." Exhibit B.

20. Lawson, angry that Peterson had once again rejected his unwanted sexual advances, thereafter began to harass Peterson and retaliate against her.

21. On or around July 17, 2013, less than a week after Peterson commenced her employment with Avalon as Housing Director, Administrative Assistant Stanley asked Peterson to sign an employment agreement that listed Peterson's position as "Housekeeper" – a clear

demotion from the administrative position which Avalon had offered her and that she had accepted just weeks earlier.

22. Even more problematic was the fact that this demotion kept her under the direct supervision of Lawson, her sexual harasser, when Avalon was already made aware of the sexual harassment allegations of Peterson through Krause and Human Resources.

23. Peterson refused to sign the employment agreement until she received an explanation of her job title, particularly since this came on the heels of her rejection of Lawson's sexual harassment and her complaint regarding said harassment to Avalon.

24. Peterson also began to be isolated by management and excluded from work events.

25. For example, Peterson was not invited to various luncheons attended by most, if not all other, staff and employees.

26. In addition, Peterson was shunned by her other co-workers and the management, both on the clock and during lunch breaks, which only occurred after her rejection of Lawson's sexual harassment. No one associated with her, spoke with her, or interacted with her unless absolutely necessary.

27. Furthermore, Lawson and Stanley sought to have Peterson disciplined by creating trumped up or trivial reasons to write Peterson up, including but not limited to perceived problems with her cleaning, adding additional, embarrassing duties to her responsibilities, and holding her responsible for meetings she was either not informed of or given wrong information.

28. On or before July 19, 2013, per the standard requirements of Avalon, Peterson complained of sexual harassment to Krause, the Building Administrator and detailed the

events that had taken place between herself (Peterson) and Lawson. Amazingly, rather than taking steps to remedy or even address the situation, Krause told Peterson to take Lawson's sexual harassment as a "compliment" and that she would still be required to share a small office with Lawson.

29. During this same meeting, Krause belittled Peterson, telling her she never liked her, that she was to stay out of the front offices, that she was not to make any friends, and that Peterson had approached Krause "begging" for a job.

30. Krause further humiliated and berated Peterson by telling her to remember that she was "only a housekeeper," further reinforcing the fact that Avalon had demoted Peterson.in retaliation to her rejection of Lawson.

31. On or about July 24, 2013, Lawson further retaliated against Peterson by assigning her a new work schedule that required her to work 40 hours per week before residents entered the Facility, despite the fact that she was hired with the understanding that she would only work Mondays, Wednesday, and Fridays from 8:30 a.m. to 4:30 p.m. until residents moved in and a full-time schedule could be negotiated. This schedule, a requirement for her son's daycare schedule, was a significant factor in Peterson's decision to take the job in the first place, as was Lawson's promise that he would be flexible in scheduling her shifts.

32. When Peterson asked Lawson why he changed her hours, Lawson's only response was "these are your new hours," and he made no effort to clarify the hours or work with Peterson's schedule, as he had previously promised to do. Lawson knew this schedule was entirely infeasible for Peterson, as she would have to pay for full-day daycare

expenses for her two-year-old son. Upon information and belief, this was yet another attempt by Lawson to force Peterson to resign because she turned down Lawson's sexual advances and had complained about the sexual harassment to management.

33. On or about July 25, 2013, because she was unable to make daycare arrangements for her son overnight, Peterson arrived at work several hours early to clean the front offices, in accordance with her new schedule and at the request of Krause, who had previously told Peterson she didn't want to see her in the offices.

34. Upon arriving, Peterson was met at the office by Krause, who again belittled her, implying she was stupid for not obeying the new schedule or budgeting for day-care, and sent her home for coming in early.

35. When Peterson came back to work later that day, Lawson again retaliated against her by telling her to wash a chair in a condescending manner. He and several other staff members, including Michelle Stanley, then watched and laughed as she cleaned it, before walking out of the room.

36. Desperate for anyone in Avalon management to take her concerns seriously, Peterson met with Human Resources Representative Kurt Anderson ("Anderson") on or around July 27, 2013, and explained to him that Lawson had sexually harassed her and that after she had rejected his sexual advances and reported him to Krause, both Lawson and Krause began retaliating against her by isolating her, demoting her to housekeeper, adjusting her schedule arbitrarily, and being burdensome and overbearing in their supervision and management of her alone.

37. Anderson summarily dismissed the allegations, declared that Peterson had not been

|   |   |
|---|---|
|   | harassed, and admonished Peterson to continue work as usual in spite of the problems identified. |
| 38. | After her initial meeting with Anderson, Peterson expressed her concerns to the Human Resources Department representative on four (4) other, separate occasions. All of her complaints were again dismissed and Peterson was told she had not been harassed. |
| 39. | Avalon's total disregard for Peterson's complaints of sexual harassment and retaliation resulted in additional retaliatory actions. On or about August 1, 2013, Peterson was cleaning bathrooms when she accidentally spilled a bucket of water onto the carpet. When Peterson asked Lawson for help cleaning up the mess, Lawson put the carpet cleaner together, plugged it in, walked away, and yelled "bitch" as his back was turned away from her. |
| 40. | Additionally, on or before August 2, 2013, Lawson wrote up Peterson for not locking her cart, despite the fact that Peterson had previously been instructed that she only needed to lock up the cart when residents were in the building, which was not the case on the day in question. Moreover, Peterson's cart was being used by Certified Nurses Assistants that day and the lock on the cart was missing. |
| 41. | Peterson refused to sign the write up, as it was clear to her that Lawson was only attempting to discipline her because he was upset that she had rejected his sexual advances and had reported his sexual harassment to management. |
| 42. | When Peterson arrived to work on or about August 3, 2013, Lawson immediately called her into an insubordination meeting because of showing up early on July 25th and refusing to sign the write-up regarding the cart. Krause and Michelle Stanley were also in |

attendance.

43. When Peterson requested that a neutral third party participate, Krause and Lawson flatly refused.

44. During the insubordination meeting, Krause accused Peterson of acting irrationally when she was written up for not locking her cart, including throwing tantrums, slamming her fist, down, and other similar actions.

45. Peterson acknowledged being angry about the situation and throwing the paper down, but the rest of the accusations were without merit.

46. Peterson then said she was tired of being walked on, even if she was, in Krause's words, "just a housekeeper."

47. After the conclusion of the Insubordination meeting, Peterson was told to clock out and leave Facility.

48. While doing do, Peterson was followed out of the building by Lawson.

49. Never at any time up to this point was Peterson allowed a neutral third party from Avalon to attend any meetings, nor did Avalon ever acknowledge any kind of wrongdoing on its part.

50. On or about August 14, 2014, Avalon issued Peterson a Notice of Administrative Leave for insubordination. See Notice of Administrative Leave, a true copy of which is attached as **Exhibit C.**

51. On or before August 17, 2013, Avalon offered Peterson two weeks' severance pay on the condition that she sign termination paperwork absolving the company of all liability and waiving any possible claims against Avalon or its employees. Peterson refused to sign the

agreement.

52. On or about August 29, 2013, after apparently finally conducting a full investigation of Peterson's complaints, Avalon reversed their position and unconditionally reinstated Peterson, announced that Lawson had been fired, expunged Peterson's employment record, and enclosed payment for back pay to cover the period of her unjust suspension. See Letter of Unconditional Reinstatement, a true copy of which is attached as **Exhibit D.**  This was a complete reversal of all actions, statements, and positions from Avalon up to this point, including correspondence between attorneys Peter Sabey of Avalon and Steve Sumsion of Peterson. See Sabey Correspondence, a true copy of which is attached as **Exhibit E**.

53. Although Peterson appreciated Avalon's acknowledgment of Lawson's harassment and management's subsequent retaliatory actions against her, Avalon still made no effort to compensate her for the sexual harassment itself or the damages that she suffered at the hands of Lawson and the various other managerial employees, who not only ignored or trivialized her complaints, but in fact retaliated against her for raising her concerns.

54. Peterson attempted further negotiations with Avalon to avoid litigation, but Avalon refused to appropriately compensate her for the sexual harassment and retaliation she suffered from various members of company management.  On the advice of her attorney, she did not go back to work or accept the check until such negotiations occurred in good faith, and was terminated as a result.

55. Following her termination, Peterson filed a charge of discrimination with the Utah Labor Commission in a timely manner. She received her right to sue notice from the

Commission on June 18th, 2015.

## COUNT I
### Sexual Harassment in Violation of
### Title VII and Sec. 34A-5-106 of the Utah Code against Avalon

56. Peterson fully incorporates the foregoing paragraphs by this reference.

57. Peterson is a female, and is therefore a member of a protected class under Title VII and Sec. 34A-5-106 of the Utah Code.

58. As outlined above, and incorporated herein, Avalon purposefully and intentionally discriminated against Peterson based upon her sex, in violation of Title VII, when she was subject to severe and pervasive sexual harassment by her direct manager and supervisor, Lawson.

59. Peterson is entitled to recover damages for all pecuniary losses (past and future), emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and all other losses caused by Avalon's unlawful discrimination.

60. Avalon's actions described above were done with malice or a reckless indifference to Peterson's federally protected right to work in an environment which is not polluted with sexually offensive conduct.  Due to the willful and malicious nature of the discrimination against Peterson and the fact that the perpetrator was a management official, Peterson is entitle to an award of punitive damages in an amount sufficient to deter Avalon from engaging in discriminatory conduct in the future.

61. Peterson is entitled to recover all attorneys' fees and costs expended in prosecuting this action.

62. Peterson is entitled to other such relief as this Court deems appropriate.

## COUNT II
### Retaliation in Violation of
### Title VII and Sec. 34A-5-106 of the Utah Code against Avalon

63. Peterson fully incorporates the foregoing paragraphs by this reference.

64. Peterson opposed Lawson's unlawful sexual harassment by rejecting him repeatedly and firmly. Peterson also reported Lawson's unlawful sexual harassment to the building manager and the human resource department of Avalon. Peterson's actions constituted protected activities under both Title VII and Sec. 34A-5-106 of the Utah Code.

65. Because of her opposition to Lawson's unlawful sexual harassment, Avalon, through Lawson, Krause, and other management within the company, retaliated against Peterson and took the following adverse employment actions against her, including but not limited to:

    a. Demoting Peterson to Housekeeper;

    b. Forcing Peterson to do extra or undesirable work;

    c. Isolating and belittling Peterson regularly;

    d. Forcing Peterson to work in the same office and under her sexual harasser, Lawson, after it was made known to management that Lawson had sexually harassed her.

66. Peterson is entitled to recover damages for all pecuniary losses (past and future), emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and all other losses caused by Avalon's unlawful retaliation.

67. Avalon's actions described above were done with malice or a reckless indifference to Peterson's federally protected right to complain about sexual harassment. Due to the

        willful and malicious nature of the retaliation against Peterson, Peterson is entitled to an award of punitive damages in an amount sufficient to deter Avalon from engaging in retaliatory conduct in the future.

68.    Peterson is entitled to recover all attorney fees and costs expended in prosecuting this action.

69.    Peterson is entitled to other such relief as this Count deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Peterson requests the following relief:

1.    For judgment against Avalon for Sexual Harassment including front pay and/or reinstatement, emotional distress, and punitive damages, together with pre-judgment and post-judgment interest, court costs and attorney fees as provided by law or by contract, together with such incidental and consequential damages as may be proven;

2.    For judgment against Avalon for Retaliation including front pay and/or reinstatement, emotional distress, and punitive damages, together with pre-judgment and post-judgment interest, court costs and attorney fees as provided by law or by contract, together with such incidental and consequential damages as may be proven; and

3.    For such other or further relief as this Court may deem just and proper under the circumstances.

//

//

//

<u>REQUEST FOR JURY TRIAL</u>

Peterson requests a trial by jury on all claims so triable in this case.

Respectfully submitted this 17th day of September, 2015.

**SUMSION BUSINESS LAW**

<u>/s/ Steven R. Sumsion</u>
Steven R. Sumsion (#8317)
Kevin R. Worthy (#13900)
Jason Zundel (#15293)