IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| LACIE PETERSON, an individual,<br><br>Plaintiff,<br><br><br><br>vs.<br><br><br>AVALON CARE CENTER – VA PAYSON, LLC, a Utah Limited Liability Company,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br><br><br><br><br>Case No. 2:15cv671<br>Judge Dee Benson |

This matter is before the Court on Defendant Avalon Care Center's ("Avalon Payson")

motion for summary judgment on all claims brought by Plaintiff Lacie Peterson in this action.

At oral argument on the motion, Avalon Payson was represented by David C. Castleberry.

Plaintiff Lacie Peterson was represented by Steven R. Sumsion. At the conclusion of the

hearing, the Court took the matter under advisement. Now, having further considered the law

and facts relating to the motions, the Court renders the following Memorandum Decision and

Order.

# BACKGROUND

On June 10, 2017, Peterson applied on-line for the position of "Director of Housekeeping" with Avalon Payson. (Am. Compl. ¶ 12 & Ex. A.) In the on-line listing, Avalon Payson indicated that it was a "[n]ew 108 bed VA Home in Payson, Utah." (*Id.*, Ex. A at 2) The job-posting described the housekeeping position as a "housekeeping supervisor" who would be "responsible to supervise the facility's day-to-day housekeeping and related functions including staffing, supply ordering and supervision to ensure facility policy and standards are met, and oversee and manage all aspects of the laundry operations of the facility." (*Id.*)

On June 20, 2017, Peterson interviewed for the position with several Avalon Payson employees, including the facility's Administrator, Shauna Kraus ("Kraus"), and Kelly Lawson ("Lawson"). (Am. Compl. ¶14.) At the time, Peterson believed she was interviewing for the "Lead Director of Housekeeping" position for which she had applied on-line. (*See id.*; Dkt. No. 40-1, Peterson Dep. at 22.) However, as Kurt Anderson, Director of Employee Relations, later acknowledged, the posting's reference to a "Lead Director" of housekeeping position was an error because "Lead Director of Housekeeping" was not a position that existed within the Avalon system. (Dkt. No. 4–2, Anderson Dep. at 36 (stating "we don't have housekeeping directors in any of the facilities").) Despite Avalon's mistaken posting, Avalon Payson referred to Peterson's position as "housekeeper," rather than "Lead Director of Housekeeping," and Peterson was the *only* housekeeper hired and/or employed by Avalon Payson. (Dkt. No. 40-1, Peterson Dep. at 88.)

On June 27, 2013, Avalon Payson hired Peterson.  (Am. Compl. ¶ 15.)  On that day, Maintenance Supervisor Kelly Lawson sent Peterson a text message to inform her that she had been given the job and stated:  "I want you as my lead housekeeper.  Work will be M/W/F.  Part time until arrangements can be made." (*Id.*)

The next day, on June 28, Lawson and Peterson had the following conversation via text messaging.  First, Lawson sent a message to Peterson stating:  "Would it be inappropriate to ask u out."  (Am. Compl. ¶ 20 & Ex. B.)  Peterson responded, saying, "Lol, wow.  So the truths revealed!!  That's why you hired me :) not because you think I will be a great addition to Avalon. . . only because you thought I was cute :)." (*Id.*)  Lawson responded a few minutes later saying, "NO wow sorry I shouldn't have opened my mouth.  You will be a great addition to Avalon, yes I think u r very sexy but that's not why I hired u!!"  (*Id.*)  Peterson responded, "First of all thank you very much for the compliment.  I'm at a place in my personal life right now that 'sexy' wouldn't describe the way I feel.  2ndly, I am very hesitant to get involved with anyone while going through this divorce, especially with the (supervisor of my new job) I haven't even started!" (*Id.*)  Within minutes, Peterson followed up with, "Kelly please don't take it personal.  I really am flattered and you are a good looking guy but I am simply not ready."  (*Id.*)  Lawson replied, "Way cool I just asked if it was inappropriate, I didn't actually ask, and I'm not like that I wouldn't hold anything against u, I'm the most laid back guy u will meet."  (*Id.*)

Over the course of the next two weeks, between Peterson's hire date and start date, in addition to the text exchange set forth above, Peterson and Lawson exchanged additional text messages related to issues regarding Peterson's employment at Avalon, including Peterson's

start date and time, and that Peterson would work "3 days a week in the beginning." (Am. Compl. Ex. B; Dkt. No. 40-1, Peterson Dep. at 38-41.)

Peterson's employment began on July 15, 2013. Kraus and Lawson filled out an "Employee Action Form" marking the beginning of Peterson's employment, and stating that Peterson's job title was "housekeeping." (Dkt. No. 40-8, Employee Action Form.) On Peterson's "new hire" paperwork, which she filled out herself, Peterson listed her job title as "housekeeping." (Dkt. No. 40-9, New Hire Paperwork.) That Peterson was hired as a part-time housekeeper who would transition to full-time was stated in the initial text messages from Lawson and reinforced in Peterson's offer letter, which she received from Avalon Payson on July 24, 2013. (Dkt. No. 40-10, Offer Letter (referring to Peterson as "housekeeper" and stating that her budgeted hours would be "part time, going full time as of July 29, 2013, per pay period").)

On July 15, 2013, during Peterson's first day at Avalon Payson, Peterson claims that Lawson "ask[ed] about [Peterson's] sex life" saying, "I bet you are the type of girl who just wants sex once a month." (Am. Compl. ¶ 24.) Later that same day, while Peterson was assembling a wheelchair, Peterson claims Lawson grabbed her by the hips as he passed her in the hallway. (Am. Compl. ¶ 24; Dkt. No. 40-1, Peterson Dep. at 68.)

That night, after her first day of work, on the evening of July 15, 2013, at 7:22 p.m., Peterson sent Lawson the following text: "Kelly i freaking leaked!! I can't believe you didn't tell me!" (Am. Compl. Ex. B, Text Messages.) Lawson responded, "Honey I can't look at your bod all day, if I would have seen it believe me I would tell u." (*Id.*). A few minutes later,

Peterson replied saying, "thank God you didn't see!  I'm so embarrassed ! And thank God you would of told me :)." (*Id.*)

The next day, around noon on July 16, 2013, Peterson sent the following text message to Lawson: "Okay, thinking about the response you sent back to me last night in regards to my personal female issue, Lol . . . I would much rather you not check my body out at all!  That text you sent me made me feel uncomfortable.  I will be a great right hand man but as far as a personal, physical relationship. I won't be going there with you.  Your my supervisor :)."  (*Id.*)

Within the first few days of working at Payson Avalon, Peterson approached Michelle Stanley, the assistant to Avalon Payson's Administrator Shauna Kraus, and told Stanley that she felt uncomfortable working around Lawson given their prior text exchanges and Lawson's conduct at work.  (Dkt. No. 40-1, Peterson Dep. at 51-52.)  Stanley suggested that Peterson make an appointment with Kraus.  (*Id.* at 52.)

On or about July 19, 2013, approximately four days after she started working at Avalon Payson, Peterson scheduled a meeting with the facility's Administrator, Shauna Kraus, to discuss Lawson's conduct and to "get it straight in [her] mind once and for all what exactly [she] was hired on as." (Dkt. No. 40-4, Peterson Journal; Dkt. No. 40-1, Peterson Dep. at 102-03.)  During the meeting, Kraus explained that she did not hire Peterson to be a "director" of housekeeping, and that Peterson was hired as a housekeeper with Lawson as her supervisor.  (Dkt. No. 40-4, Peterson Journal.)  Peterson told Kraus that she "wasn't comfortable with the situation" with Lawson, and that Lawson had "asked [her] out, pryed into [her] personal life, and now was treating [her] differently."  (*Id.*).  Peterson claims that Kraus did not seem to take Peterson's

concerns about Lawson seriously and told her that "being called 'sexy' was a compliment."  (*Id.*)
Peterson also felt that Kraus did not like her and was "extremely rude."  (*Id.*)

After meeting with Kraus, Peterson says that she "took it upon [herself] to stop using the
office she previously shared with Lawson."  (Dkt. No. 40-1, Peterson Dep. at 72.)  Peterson used
the facility's break room instead of the office "so [she] didn't have to be in the office with
[Lawson] and feel uncomfortable."  (*Id.*)

On July 24, five days after Peterson's meeting with Kraus, Lawson provided Peterson
with a new written schedule requiring Peterson to work full time.  (Dkt. No. 40-4, Peterson
Journal; Dkt. No. 40-1, Peterson Dep. at 102-03).  This new schedule was consistent with
Lawson's prior text and Peterson's Offer Letter, which she received that same day, indicating
she would be part time "in the beginning" then shift to full time.  (Am. Compl. Ex. B, Text
Messages; Dkt. No. 40-10, Offer Letter.)

The next day, on July 25, 2013, Director of Employee Relations Kurt Anderson visited
Avalon Payson and met with Peterson regarding several concerns, one of which was Lawson's
conduct.  Anderson's notes from the meeting document that at the end of the meeting he asked
Peterson whether she felt she had been illegally harassed during her employment at Avalon
Payson.  (Dkt. No. 40-2, Anderson Dep. at 19; Dkt. No. 40-3, K. Anderson Handwritten Notes,
dated July 25, 2013.)  Anderson explained what constituted harassment, and Peterson responded
that she did not believe she had been harassed.  (*Id.*)  Anderson then asked Peterson if she could
continue to work with Lawson, to which Peterson answered, "yes."  (*Id.*)  Peterson said, about
the meeting with Anderson, that she "felt for the first time somebody had listened to what [she]

was trying to say." (Dkt. No. 40-1, Peterson Dep. at 63.)

Approximately one week later, on August 1, 2013, Peterson spilled a bucket of water and asked Lawson for help with the carpet cleaner. (Dkt. No. 40-4, Peterson Journal; Dkt. No. 40-1, Peterson Dep. at 102-03.) Lawson helped Peterson assemble the carpet cleaner, and as he got up and turned away from Peterson, Peterson heard Lawson say the word "bitch." (*Id.)* Peterson reported the incident to Kurt Anderson, and a few days later reported the incident to John L. Walters, an Avalon Payson social worker. (Dkt. No. 40-5, Witness Statement of John L. Walters, dated Aug. 5, 2013; Dkt. No. 40-2, Anderson Dep. at 83-84.) Walters noted in his statement (and Peterson agreed during her deposition) that Lawson's words may not have been directed at Peterson and he may have simply been frustrated with ongoing construction issues at the facility. (*Id.*; Dkt. No. 40-1, Peterson Dep. at 74 (testifying that she "do[es] remember thinking that" Lawson may have been complaining about something else when he used the word "bitch").)

By early August 2013, Peterson felt like she was being "isolated" by Lawson, Kraus and others at Avalon Payson. Peterson claims that she was not invited to luncheons and work meetings, or that Lawson would tell Peterson the wrong time to attend such meetings. (Am Compl. ¶76; Dkt. No. 40-1, Peterson Dep. at 165.)

On August 13, 2013, after approximately one month of working at Avalon Payson, Lawson issued Peterson a non-disciplinary warning for failing to lock her housekeeping cart in accordance with state and federal regulations. (Dkt. No. 40-13, Performance Documentation Form.) In the written warning, Lawson noted that it is a "Federal and State requirement" to lock

up housekeeping carts, the violation of which "could result in citations to the facility which could result in liability to bill for services or civil money penalties." (*Id.*) Peterson refused to sign her warning.

Peterson refused to sign the written warning form because she felt like she was not required to lock the cart given that there were no veterans in the facility at the time. (Dkt. No. 40-1, Peterson Dep. at 81.) According to a witness statement signed by Michelle Stanley, Shauna Kraus and Kelly Lawson after the incident, Peterson admitted that Lawson had told her that "it did not matter if we had residents or not." (Dkt. No. 40-16, Witness Statement.)

The next day, on August 14, 2013, Peterson was placed on administrative leave by Avalon Payson's Administrator, Kraus, pending an investigation for insubordination relating to Peterson's refusal to sign her written warning form. (Dkt. No. 40-14, Notice of Admin. Leave; Dkt. No. 40-1, Peterson Dep. at 89.) Peterson was on administrative leave for approximately two weeks, during which time Avalon Payson investigated Peterson's insubordination and continued to investigate Peterson's complaints about Lawson. While on administrative leave, Peterson hired an attorney, Steven Sumsion. (Dkt. No. 40-17, Sumsion Dep. at 5.)

On August 29, 2013, after investigating Peterson's complaints, Avalon Payson unconditionally reinstated Peterson to her previous position. (Dkt. No. 40-15, Unconditional Reinstatement of Lacie Peterson, dated Aug. 29, 2013; Dkt. No. 40-1, Peterson Dep. at 126-27.) Avalon Payson's reinstatement letter stated that Avalon Payson had completed its internal investigation, terminated Lawson, and that Peterson was returned to work in her previous capacity, with the same pay and benefits she had before her leave. (*Id.*) Avalon Payson also

issued Peterson a check for $552.87, which she cashed, for the time she spent on administrative leave. Avalon Payson's reinstatement of Peterson was not contingent on any release of claims against Avalon Payson. (Am. Compl. ¶ 15 (stating Avalon Payson's offer was "unconditional").) Additionally, Avalon Payson expunged all written warnings from Peterson's employee file upon her return to work. (Dkt. No. 40-15, Reinstatement Letter.)

On September 3, 2013, Peterson, her attorney, and representatives of Avalon Payson, including its counsel, met to discuss Peterson's return to work. (Am. Compl. ¶¶ 59-60; Dkt. No. 40-17, Sumsion Dep. at 14.) During the return-to-work meeting, counsel for Avalon Payson reiterated the terms of the reinstatement as outlined in the reinstatement letter, including that Peterson's reinstatement was unconditional and that Lawson had been terminated. (Dkt. No. 40-1, Peterson Dep. at 134; Dkt. No. 40-17, Sumsion Dep. at 15-16.) Avalon Payson also offered to pay Peterson's attorney's fees accrued to that date. (Dkt. No. 40-18, Email from Sabey to Sumsion dated Sept. 4, 2013; Dkt. No. 40-17, Sumsion Dep. at 24.)

At the meeting, Peterson's attorney, Steven Sumsion, sought to impose additional requirements for Peterson's return to work, including that Peterson be given her own office, a cell phone, and that Peterson be promoted to supervisor of building maintenance. (Dkt. No. 40-17, Sumsion Dep. at 17-19.) Peterson also stated that she did not want to return to work because "Shauna Kraus was still employed at Avalon Payson." (Dkt. No. 40-1, Peterson Dep. at 140.) Peterson recalls her attorney proposing a contract, purportedly between Sumsion, Peterson and Avalon Payson, to ensure that Peterson would not be the subject of future retaliation from Kraus. (*Id.* at 140, 141.) Peterson's attorney explained that they were merely seeking an

"acknowledgment, apology, something in writing" regarding Avalon's actions. (Dkt. No. 40-17, Sumsion Dep. at 19.)

In response, Avalon Payson offered to "designate a representative other than [Kraus and the] HR Director, for [Peterson] to raise any concerns or complaints about her work environment going forward." (Dkt. No. 40-18, Sumsion Email; Dkt. No. 40-17, Sumsion Dep. at 35; Dkt. No. 40-11, Anderson Return-to-Work Meeting Notes.) However, Avalon Payson declined Sumsion's additional demands regarding Peterson's own office, cell phone, and promotion.

Because Avalon Payson refused to fulfill these demands, and based on Sumsion's implicit advice to Peterson that her case would be worth more money if she did not return to work, Peterson refused to resume work after having been unconditionally reinstated. (Dkt. No. 40-1, Peterson Dep. at 144; Am. Compl. ¶ 60 ("On advice of her attorney, she did not go back to work"); Dkt. No. 40-17, Sumsion Dep. at 33-34 (testifying that it was "implicit" in his advice to Plaintiff that she could possibly obtain more money if she did not return to work).)

On September 17, 2015, Peterson filed the Complaint in this case, asserting two claims, both under Title VII of the Civil Rights Act of 1964 and the Utah Discrimination Act: (1) that she suffered a hostile work environment as a result of harassment by Kelly Lawson, and (2) that she was subjected to retaliation after complaining to management about Lawson's actions. (Am. Compl. at 12-16.) In the motion now before the Court, Avalon Payson moves for summary judgment on both claims, asserting: (1) that Peterson's allegations do not rise to the level of severe and pervasive harassment necessary to establish an actionable claim for hostile work environment, and (2) that Peterson did not suffer an "adverse employment action" as a result of

her complaints. Additionally, Avalon Payson claims that even if Peterson were to prevail on her claims, she suffered no recoverable damages because Peterson's refusal to return to work was unreasonable as a matter of law.

## DISCUSSION

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see* *Anderson v. Libberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986). The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir. 1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Not every issue of fact or conflicting inference presents a genuine issue of material fact. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to overcome a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252; *see also Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1175 (10th Cir. 1999). Finally, conclusory allegations without supporting evidence, do not raise a genuine issues of material fact, especially in light of other evidence in the record. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1178 (10th Cir. 2006); *see Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004) ("Unsupported conclusory allegations . . . do not create a genuine issue of fact."); *Cone v. Longmont United*

*Hosp. Ass'n*, 14 F.3d 526, 530 (10th Cir. 1994) (providing that "allegations alone will not defeat summary judgment"). With this standard in mind, the Court considers the two causes of action brought by Plaintiff.

I.     Hostile work environment

"To survive summary judgment, a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . [and] must also produce evidence from which a rational jury could infer that she was targeted for harassment because of her gender, race or national origin." *Sandoval v. City of Boulder*, 388 F.3d 1312, 1326-27 (10th Cir. 2007) (quoting *O'Shea v. Yellow Tech. Servs.*, 185 F.3d 1093, 1098 (10th Cir. 1999)).[1]

"Title VII does not establish 'a general civility code' for the workplace." *Morris v. City of Colo. Springs*, 666 F.3d 654, 663-64 (10th Cir. 2013) (citation omitted). "Accordingly, the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." *Id.* While the "severity and pervasiveness evaluation [of a hostile work environment claim] is particularly unsuited for summary judgment because it is quintessentially a question of fact," the Tenth Circuit has often "affirmed the resolution of this issue at the summary judgment stage." *Payan v. United Parcel Servs.*, 2016 WL 5724743, *4 (D. Utah Sept. 30, 2016) (quoting *McElroy v.*

_____

[1]For purposes of the motion for summary judgment, Avalon Payson does not dispute that Peterson is a member of a protected class and was subjected to "unwelcome" harassment. Accordingly, for purposes of this motion the sole issue is whether that harassment was sufficiently severe and pervasive.

*Am. Family Ins.*, 630 Fed. Appx. 847, 849 (10th Cir. 2015)).

Additionally, to survive summary judgment Peterson must show that the environment was both objectively and subjectively hostile or abusive. *Morris,* 666 F.3d at 664 (quoting *Davis v. U.S. Postal Serv.*, 142 F.2d 1334, 1341 (10th Cir. 1998)). The court assesses "the objective severity of the harassment from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* These circumstances must be viewed in their totality and include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Chavez v. New Mexico*, 397 F.3d 826, 832-33 (10th Cir. 2005)). These standards are "sufficiently demanding" to ensure that they "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language" or "tense personal relationships." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *see also Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1265 (10th Cir. 1998); *Jeffries v. Kansas*, 147 F.3d 1220, 1232-33 (10th Cir. 1998).

Turning to the facts of this case, Peterson points to the following allegations in support of her hostile work environment claim: (1) Peterson's supervisor, Lawson, called Peterson "sexy" and asked if "it would be inappropriate to ask [her] out on a date" via text message (Dkt. No. 40-1, Peterson Dep. at 34-35); (2) Lawson "grabbed Peterson's hips one day as [they] were putting wheelchairs together" (*id.* at 68); (3) Lawson commented to Peterson, "I bet you are the type of girl who wants sex once a month" (*id.*); and (4) Lawson said the word "bitch" after helping Peterson clean up a spilled bucket of water (*id.* at 72). (*See also* Am. Compl. ¶¶ 20, 24, 45.)

Reviewing these allegations, the Court concludes that Peterson has failed to produce evidence, whether considered in isolation or in the aggregate, of an objectively severe or pervasive hostile work environment. Stated another way, no reasonable employee would find Lawson's conduct to be so severe, pervasive, threatening or humiliating as to alter the terms or conditions of employment. Lawson's remark that he thought Peterson was "sexy," sent via text message prior to Peterson's first day of work and in the context of asking Peterson if it would "be inappropriate to ask [her] out on a date," is not severe, pervasive, threatening or humiliating, and the Court finds that no reasonable juror could find that this conversation could have humiliated Peterson or interfered with her work performance.

The same can be said for Lawson "grabbing" Peterson's hips on a single occasion as he passed her in the hallway, and Lawson stating in another situation, "I bet you are the type of girl who wants sex once a month." (Am. Compl. ¶24.) Such isolated actions are simply insufficient as a matter of law to constitute severe or pervasive behavior sufficient to interfere with Peterson's job duties. *See*, *e.g.*, *Lowe v. Cardinal Health Inc.*, 61 F.3d 1228, 1236 (N.D. Ala. 2014) (concluding that conduct failed to meet the "severe and pervasive standard" where supervisor's conduct was not "physically threatening or humiliating" and because the "cumulative effect [did not] unreasonably interfere with [plaintiff's] job duties").

Similarly, the court finds that Lawson's utterance of the word "bitch," on one occasion, "as his back was turned away" (Am. Compl. ¶45), is not actionable harassment. Peterson acknowledged at the time and again during her deposition that Lawson may have simply been frustrated about cleaning up Peterson's mess and the on-going construction at the facility when

he used the word. (Dkt. No. 40-5, Witness Statement of John L. Walters; Dkt. No. 40-1, Peterson Dep., at 74 (testifying she "do[es] remember thinking that" Lawson may have been complaining about something else when he used the word "bitch").) And even if the word "bitch" was directed at Peterson, a one-time "offensive utterance" cannot rise to the level necessary for Peterson to succeed on her claim. *See Schofield v. Maverik Country Store*, 26 F. Supp. 3d 1147, 1159-60 (D. Utah 2014) (holding that repeated use of the terms "ho," "kitchen bitches," and "lesbo" was insufficient to create actionable hostile work environment).

Additionally, Peterson's own admissions at the time of the events at issue indicate that Peterson did not subjectively believe she was subjected to a hostile work environment. During Peterson's employment with Avalon Payson, Peterson met with Avalon Payson's Director of Employee Relations, Kurt Anderson, wherein Peterson expressed her concerns over Lawson's conduct. Anderson then explained to Peterson the definition of sexual harassment, and asked Peterson "Do you feel you were illegally harassed?" and Peterson answered "no." (Dkt. No. 40-11, Anderson's hand-written notes, dated July 25, 2013.) Similarly, when Anderson asked Peterson if she could continue to "work with [Lawson]," Peterson answered "yes." (*Id.*) The Tenth Circuit has expressly stated: "[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Payan v. United Parcel Serv.*, 2016 WL 5724743, at *5 (D. Utah Sept. 30, 2016).

In her opposition to Avalon Payson's motion for summary judgment, Peterson raises several additional complaints about working at Avalon Payson. Many of these, however, have

nothing to do with the alleged harassment by Lawson, and focus instead on the actions of Shauna Kraus or written discipline Peterson received.[2]  To the extent any of these actions can in any way be attributed to Lawson – such as being "written up for not locking her cart," being "assigned undesirable work," and having her schedule changed in such a way that was difficult to arrange childcare" (Pl.'s Opp'n at 12, 13-14) – the court similarly concludes that none of these instances rise to the level of severe or pervasive treatment sufficient to satisfy a hostile work environment claim.

Similarly, Peterson's argument, that Avalon Payson is attempting to create a "double standard" by claiming that Lawson did not sexually harass Peterson while acknowledging that it terminated Lawson's employment due to his improper conduct, is unavailing.  This argument has no bearing on the essential elements of Peterson's claim.  Moreover, there is no evidence that representatives of Avalon Payson have ever taken the position that Lawson unlawfully harassed Peterson based on her gender.  Terminating the employment of an employee or supervisor is not evidence of harassment, especially in this case where the Plaintiff expressly stated she did not believe she had been unlawfully harassed.

Accordingly, for the reasons stated, and applying well-established standards to the undisputed facts, the court concludes that no severe or pervasive conduct occurred in this case sufficient for Peterson to prevail on her hostile work environment claim.

II.     Retaliation

---

[2]Peterson explicitly stated in her deposition that her complaints were centered on Kelly Lawson.  She agreed that she never complained of harassment by anyone other than Lawson and that she never made any complaints about other Avalon Payson employees.  (Dkt. No. 40-1, Peterson Dep. at 131.)

To demonstrate prima facie retaliation under Title VII and the Utah Anti-Discrimination Act, Peterson must show (1) that she engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action. *Payan v. United Parcel Serv.*, 2016 WL 5724743, at *7 (D. Utah Sept. 30, 2016) (citing *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008)).

The United States Supreme Court has determined that to constitute an "adverse employment action," "an employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006). Thus, "the inquiry is an objective one, and not based on a 'plaintiff's personal feelings.'" *Daniels v. United Parcel Serv.*, 701 F.3d 620, 638 (10th Cir. 2012) (quoting *Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009)). Applying these well-established principles to this case, the Court concludes that Peterson has failed to show that she suffered an adverse employment action as the result of any protected activity.

First, the Court finds there is no protected conduct here because, as set forth above, no reasonable person would believe that sexual harassment occurred, and Peterson herself did not subjectively believe that she had been sexually harassed. The United States Court of Appeals for the Tenth Circuit has explained:

> As the law stands, Title VII does not create a claim for every employee who complains about the potential for Title VII violations or about other employees' isolated racial slurs. It protects an employee who opposes 'any practice made an unlawful employment practice.' 42 U.S.C. § 2000e-3(a), or who 'reasonably

believes' he is opposing a practice made an unlawful practice by Title VII. The employer must know not only that the employee has opposed an action by the employer . . . , but that the opposition was based on a belief that the employer's action constituted discrimination prohibited by Title VII.

*Robinson v. Calvary Portfolio Servs., LLC*, 365 F. App'x 104, 112-13 (10th Cir. 2010) (citation omitted).

Second, even if this Court were to conclude that Peterson engaged in protected conduct, the actions of which Peterson complains do not constitute actionable "adverse employment actions" because they either pre-date her alleged protected activity or do not qualify as such as a matter of law.

For example, Peterson's allegation that she was demoted from "Director of Housekeeping" to "housekeeper" in retaliation for complaining about Lawson fails as a matter of law. Any confusion regarding Peterson's official title occurred *before* she engaged in any protected activity. Although the on-line job description for which Peterson applied listed "Director of Housekeeping," Kurt Anderson, explained that the job title was erroneous because "Lead Director of Housekeeping" is "not a position that existed in [Avalon's] system." (Dkt. No. 40-2, Anderson Dep. at 36.) Significantly, when Peterson filled out her new hire paperwork, Peterson herself used the term "housekeeping" to describe her position in multiple instances when asked to provide a "position description." (Dkt. No. 40-9, New Hire Paperwork.) Further, when Peterson's employment began on July 15, 2013, Kraus and Lawson filled out an "Employee Action Form" marking the beginning of Peterson's employment and stating that Peterson's job title was "housekeeping." (Dkt. No. 40-8, Employee Action Form.) Although Peterson may have been "confused" about her job title, Peterson was the *only* housekeeper

employed by Avalon at the time, and any confusion regarding her title did not affect her duties, pay, or any other material aspect of her job. Thus, Peterson's claim that she was demoted as a result of her complaints to management is not factually supported.

Peterson's allegation that she was required to work a standard, full-time schedule in retaliation for complaining to management is also unsupported. The record reflects that Lawson informed Peterson via text message on June 27, 2013, weeks prior to Peterson making any complaint, that her schedule would be "M/W/F. Part-time until arrangements can be made." (Am. Compl., Ex. B.) Peterson began her employment at Avalon Payson on July 15, 2013, and just over a week later she was given a written schedule requiring her to work Monday through Friday during standard work hours. (Dkt. No. 40-1, Peterson Dep. at 91.) Peterson's transition to full time was consistent with Lawson's June 27, 2013 text message and consistent with Peterson's offer letter, which stated: "Your budgeted hours at the time of hire are **part time, going full time as of July 29, 2013** per pay period." (Dkt. No. 40-10, Offer Letter.) Thus, Peterson's schedule change was contemplated and determined before Peterson ever complained to management about Lawson's conduct.

Peterson's claim that was assigned "extra or undesirable work" as a result of complaining about Lawson is also unsupported by the record. It does not appear that Peterson was assigned to perform any responsibilities outside her job description, which explicitly included cleaning Avalon Payson facilities and equipment, "including vacuuming, wiping, mopping, polishing, etc." (Dkt. No. 40-6, Housekeeper Job Description.) Likewise, there are no facts to support the allegation in the Amended Complaint that after complaining to management about Lawson's

conduct Peterson was "forced to work in the same office as her sexual harasser." (Am. Compl. ¶ 82(h).) Peterson readily admits that she "took it upon herself" to use a different office when she felt uncomfortable sharing with Lawson. And even if she had been "forced" to share an office with Lawson initially, that office assignment had been made prior to her complaints to management.

The only action that could even theoretically constitute an adverse employment action for retaliation purposes is the decision to "write up" Peterson for failing to lock her cart, coupled with her subsequent placement on administrative leave for insubordination. With regard to the "write up," the parties do not dispute that there was a workplace rule that carts must be locked. Peterson's written warning explains that locking a housekeeping cart is a "Federal and State requirement," the violation of which "could result in citations to the facility which could result in liability to bill for services or civil money penalties." (Dkt. No. 40-13, Performance Documentation Form.) In response, Peterson provides no evidence to show that any similarly situated co-worker was treated differently for failing to lock her cart, but rather submits her own subjective belief that the workplace rule was unnecessary under the circumstances because no veterans were residing in the facility at the time. Peterson also claims that in any event the lock on her cart was broken. Peterson's assertions are irrelevant and cannot save her retaliation claim.

The law is clear in the Tenth Circuit that written warnings that do not result in actual disciplinary action, such as the August 2, 2013 written warning, do not constitute retaliatory adverse employment actions under Title VII. *See, e.g., Howkins v. Smith*, 46 F. Supp. 3d 1175,

1190 (N.D. Okla. 2014); *Weil v. Carecore Nat., LLC*, 833 F. Supp. 2d 1289, 1297-98 (D. Colo. 2011). Moreover, under no circumstances could Peterson's written warning constitute an adverse employment action where, as in this case, the warning was completely expunged from her file. (Dkt. No. 40-15, Unconditional Reinstatement Letter, dated Aug. 29, 2013; Dkt. No. 40-1, Peterson Dep. at 127.)

Similarly, Peterson's claim that she was "placed on administrative leave" in retaliation for engaging in protected activity – an allegation she does not make in her Amended Complaint – is unavailing. Given the facts of this case, Peterson's brief placement on paid administrative leave is not an adverse employment action. Peterson has failed to show that she was placed on administrative leave for anything other than the legitimate, non-discriminatory reason that Avalon Payson was investigating the facts surrounding her insubordination. Moreover, and as previously stated, at the conclusion of that investigation, Peterson was given an unconditional offer of reinstatement to her previous position with full back pay. Avalon Payson also terminated Lawson's employment and even offered to pay her attorney's fees. Under these circumstances, Peterson's administrative leave cannot be an adverse employment action. *See*, *e.g., Juarez v. Utah*, 263 Fed. Appx. 726, 737 (10th Cir. 2008) (affirming district court's conclusion that plaintiff's paid administrative leave did not constitute material adverse action for Title VII retaliation purposes); *Baker v. City & County of Denver*, 2016 WL 54110, at *10 (D. Colo. Jan. 5, 2016) (concluding that "a brief paid administrative leave generally is not an adverse employment action, even in the context of a retaliation claim" because it "show[s] only a mere inconvenience and brief alteration of job responsibilities, followed by a restoration of the status

quo").

Finally, and as will be set forth in detail below, Plaintiff's retaliation claims also fail

because she has not established that she has any damages related to her retaliation claims. As the

United States Supreme Court has noted:

> The antiretaliation provision protects an individual not from all retaliation, but
> from retaliation that produces an injury or harm. *** In our view, a plaintiff must
> show that a reasonable employee would have found the challenged action
> materially adverse, which in this context means it well might have dissuaded a
> reasonable worker from making or supporting a charge of discrimination.

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006) (citations omitted). In

sum, the Court finds that, as a matter of law, the facts alleged by Peterson do not establish any

adverse employment action that might dissuade a reasonable worker from making or supporting

a charge of discrimination.

III.     Damages

Finally, even if Peterson had facts sufficient to survive summary judgment on the merits

of either claim, the Court finds that she has suffered no actionable damages.

The Supreme Court has held that the "primary objective" of Title VII "is to bring

employment discrimination to an end" and to "compensate victims for their injuries." *Ford

Motor Co. v. E.E.O.C.*, 458 U.S. 219, 228 & 230 (1982). "The preferred means for achieving

this goal," the *Ford* Court continued, "is through cooperation and voluntary compliance." *Id.*

(quotations omitted). Thus, Title VII is designed to "encourage Title VII defendants promptly to

make curative, unconditional job offers to Title VII claimants." *Id.* Under *Ford*, when a Title

VII defendant provides an aggrieved employee with unconditional reinstatement to a comparable

position, back pay liability ceases to accrue on the date the unconditional reinstatement is rejected. *See id.* at 234-35. The only exception to the rule is where, under "special circumstances," the plaintiff acted reasonably in refusing the offer. *Id.*

Following the Supreme Court's pronouncement in *Ford*, the Tenth Circuit has instructed that a plaintiff's unreasonable refusal to return to work after an unconditional reinstatement constitutes a failure to mitigate damages and "will cut off an employer's liability for damages [under Title VII] as of the date the offer is rejected or expires." *Albert v. Smith's Food & Drug Centers, Inc.*, 356 F.3d 1242, 1253 (10th Cir. 2004) (citing *Ford Motor Co. v. EEOC*, 458 U.S. 219, 230-32 (1982)). "In determining whether the right to relief extends beyond the date of an offer of reinstatement, the trial court must consider the circumstances under which the offer was made or rejected, including the terms of the offer and the reasons for refusal." *Giandonato v. Sybron Corp.*, 804 F.2d 120, 124 (10th Cir. 1986). "[A]n offer rejected solely for personal reasons," such as apprehension over working under a particular supervisor, "will not avoid the rule" allowing the defendant to cut off damages. *Albert*, 356 F.3d at 1253; *see also Giandonato*, 804 F.2d at 124.

Applying these principles to the facts of this case, the Court concludes that, even assuming *arguendo* that Peterson's claims were viable, Peterson suffered no cognizable damages because she failed to mitigate her damages by unreasonably rejecting Avalon Payson's unconditional offer of reinstatement. As set forth above, Avalon Payson not only reinstated Peterson to her previous position but also offered to give her the title of Lead Housekeeper; paid her wages for time missed; terminated her alleged harasser, Lawson; expunged her written

warnings and disciplinary file; offered to designate a representative "other than Shauna Kraus or Kurt Anderson" to whom Peterson could raise any complaints, and offered to pay Peterson's attorney's fees accrued to that date. (Dkt. No. 40-15, Unconditional Reinstatement.)

Applying *Ford* and its Tenth Circuit progeny, this Court concludes that Peterson's refusal to return to work under these circumstances was unreasonable, and by refusing Avalon Payson's offer of reinstatement Peterson failed to mitigate her damages.

## CONCLUSION

For the reasons stated above the Court hereby GRANTS Avalon Payson's motion for Summary Judgment.

DATED this 31st day of July, 2017.

_____
Dee Benson
United States District Judge